UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. _____

JOHN DOE #1 through #4, and
JANE DOE #1 and #2,

    Plaintiffs,

v.

C&C AGRICULTURAL FARMS LLC,
a Florida limited liability company, ERNESTO
RUBEN CORDERO, JR., CARLOS RODRIGUEZ
and REYES TAPIA-ORTIZ,

    Defendants.
_____/

## PLAINTIFFS' MOTION TO PROCEED ANONYMOUSLY

Plaintiffs JOHN DOE #1 through #4, and JANE DOE #1 and #2 (collectively, "Plaintiffs"), by and through undersigned counsel, seek an order from this Court granting them leave to proceed anonymously with their Complaint against Defendants C&C Agricultural Farms LLC, Ernesto Ruben Cordero, Jr., Carlos Rodriguez, and Reyes Tapia-Ortiz (collectively, "Defendants"),[1] and state:

### I. INTRODUCTION

This human trafficking action was filed by six undocumented agricultural laborers from Guatemala and Mexico against their former employers. Plaintiffs were hired by fraud and deception, were not paid the wages they were promised, and were not treated humanely or lawfully. Additionally, one of the Plaintiffs was sexually harassed on the job. Nonetheless,

---
[1] Plaintiffs are amenable to providing their names to Defendants' counsel pursuant to an Order providing that Plaintiffs' identities are to be revealed by Defendants' counsel only to Defendants and parties necessary to prepare Defendants' case and that, under no circumstances, are Defendants to have any direct or indirect contact with Plaintiffs.

-1-

Plaintiffs were coerced to continue to work for Defendants under such conditions by means of intimidation, threats of force, and fear of deportation. Because this matter involves facts of a highly sensitive and personal nature, Plaintiffs seek to proceed anonymously in court filings.

## II. FACTUAL BACKGROUND

### A. Human Trafficking is a National Issue and is of Particular Concern in Florida.

Human trafficking "refers to the subjection of men, women, and children to exploitative conditions that some equate with slavery."[2] The 2000 U.N. Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children defines "trafficking in persons" as:

> [T]he recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[3]

Due to its broad definition, trafficking can take many different forms, including commercial sexual exploitation, forced labor, and debt bondage.[4] Further, human trafficking is not limited to cross-border trafficking; it can occur within the boundaries of a state once a person uses illegal means to force or coerce another to engage in certain activities, as exists in this matter.

According to the United States Department of State 2013 Trafficking in Persons Report ("TIP Report"),[5] "[t]he United States is a source, transit, and destination country for men, women, and children—both U.S. citizens and foreign nationals—subjected to forced labor, debt

---

[2] Liana Sun Wyler, Cong. Research Serv., R42497, *Trafficking in Persons: International Dimensions and Foreign Policy Issues for Congress* 1 (2012), *available at* https://www.hsdl.org/?view&did=723007.
[3] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, G.A. Res. 55/25, U.N. Doc. A/55/383 (Nov. 15, 2000).
[4] *See id.* at 1.
[5] "The TIP Report is the U.S. government's principal diplomatic tool used to engage foreign governments on trafficking in persons, providing a comprehensive analysis of governmental anti-trafficking efforts." U.S. Dep't of Justice, *Attorney General's 2011 Annual Report to Congress Pursuant to the Equal Credit Opportunity Act Amendments of 1976*, 100, *available at* http://www.justice.gov/crt/about/hce/documents/ecoareport2011.pdf.

bondage, involuntary servitude, and sex trafficking."[6] The U.S. government estimated in 2010 that "as many as 17,500 people are trafficked to the United States each year."[7] The primary reason for trafficking in the U.S. is for labor,[8] as labor and service providers constantly try to meet the continued international demand for cheap labor and services.[9]

As recognized by the U.S. government, "[m]igrant labor camps tend to be common settings for labor exploitation and domestic trafficking."[10] The nature of agricultural work, combined with the particular vulnerabilities of foreign national workers, creates opportunities for unscrupulous crew leaders and agricultural employers to exploit farmworkers to increase their own financial gains, creating a particularly perilous situation for foreign national farmworkers.

"Agricultural work is often isolated and transient, and income can be irregular."[11] Migrant camps and farms are usually located in isolated, "sparsely populated areas."[12] Additionally, since the work is based on changing harvest seasons, the farmworkers face constant uncertainty regarding their livelihood and often must travel across the United States to work.[13] These conditions result in the general isolation of the farmworkers from society, as they are often forced to move for their jobs for short periods of time to places where it would be

---

[6] U.S. Dep't of State, *2013 Trafficking in Persons Report,* 381 *available at* http://www.state.gov/documents/organization/210742.pdf [hereinafter *2013 TIP Report*].
[7] Liana Sun Wyler, Cong. Research Serv., RL34317, *Trafficking in Persons: U.S. Policies and Issues for Congress* 24 (2012), *available at* http://fpc.state.gov/documents/organization/147256.pdf. *See generally 2013 TIP Report, supra* note 6; U.S. Dep't of Justice, *Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons Fiscal Year 2010, available at* http://www.justice.gov/archive/ag/annualreports/agreporthumantrafficking2010.pdf; U.S. Dep't of Justice, *Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons Fiscal Year 2011, available at* http://www.justice.gov/ag/annualreports/agreporthumantrafficking2011.pdf.
[8] *See* U.S. Dep't of State, *Trafficking in Persons Report (2010)*, 338-45, available at http://www.state.gov/documents/organization/142984.pdf [hereinafter *2010 TIP Report*].
[9] Wyler, *supra* note 2, at 1.
[10] Wyler, *supra* note 7, at 24.
[11] Polaris Project, *Labor Trafficking in Agriculture,* http://www.polarisproject.org/human-trafficking/labor-trafficking-in-the-us/agriculture-a-farms (last visited Apr. 3, 2014).
[12] *Id.*
[13] *Id.*

difficult to make personal connections.[14] Most importantly, farmworkers are forced to be flexible in complying with demands from their employers.

This situation proves particularly volatile in the case of foreign nationals, as they are even more isolated from the communities they inhabit due to their "lack of familiarity with the language, laws and customs of the U.S.," as well as their unstable immigration status in the United States.[15] Foreign national farmworkers are particularly vulnerable when crew leaders or agricultural employers: threaten them with deportation and/or incarceration; confiscate their passports or visas; concoct an increasingly high debt which they are required to pay off through labor; physically, psychologically, or verbally abuse them; or otherwise assert their power over them.[16] Generally unaware of the illegality of their employers' actions, these foreign national farmworkers become genuinely fearful because they recognize their vulnerable immigration status and have few people, if any, from whom they can seek help.[17]

The U.S. TIP Reports for 2010, 2012, and 2013 each listed Guatemala as a primary source country of trafficking victims.[18] Guatemala's pervasive poverty issues, limited economic opportunities, and limited protection of vulnerable workers[19] render Guatemalan workers particularly vulnerable to trafficking. Similarly, Mexico is fertile ground for trafficking victims in light of issues related to poverty, violence, and poor working conditions. Indeed, the TIP Reports issued between 2009 and 2013 all designate Mexico as a primary country of origin for

---

[14] *Id.*
[15] *Id.*
[16] *See* Wyler, *supra* note 7, at 11.
[17] *See id.*
[18] *See 2010 TIP Report, supra* note 8, at 338; U.S. Dep't of State, *Trafficking in Persons Report (2012)*, 360, available at http://www.state.gov/documents/organization/192598.pdf [hereinafter *2012 TIP Report*].; *2013 TIP Report, supra* note 6, at 381.
[19] Central Intelligence Agency, *The World Factbook, Guatemala, Economy* (2013), available at https://www.cia.gov/library/publications/the-world-factbook/geos/gt.html.
-4-

trafficking victims.[20] Due to the severity of human trafficking between the U.S. and Mexico, both the U.S. and Mexican governments collaborated to create a bi-national effort to combat human trafficking, complete with coordinated training, investigations, and intelligence sharing.[21]

Although human trafficking and forced labor occurs throughout the U.S., a substantial number of agricultural labor trafficking cases have been identified in Florida. "Many of the factors that are conducive to the trafficking of international victims in the U.S. – large immigrant communities, the availability of low wage jobs, entire sectors of the economy that operate with little government regulation (such as agricultural labor), and thriving commercial sex venues – all exist in Florida."[22] In 2000 and 2011, Florida ranked third amongst the states with the highest population of undocumented persons, with an estimated 800,000 in 2000 and an estimated 740,000 in 2011.[23] A federal official labeled Florida as "ground zero for modern slavery."[24] Following a "fact-finding visit [in 2008] to Immokalee, a small town at the epicenter of Florida tomato production - Senator Bernie Sanders described the conditions he encountered with these words: 'These people are being held in captivity, in some cases in chains...[For Florida farmworkers], the norm is a disaster, the extreme is slavery.'"[25]

---

[20] *See* U.S. Dep't of State, *Trafficking in Persons Report (2009)*, 57, available at http://www.state.gov/documents/organization/123357.pdf [hereinafter *2009 TIP Report*]; *2010 TIP Report, supra* note 8, at 338; U.S. Dep't of State, *Trafficking in Persons Report (2011)*, at 372, available at http://www.state.gov/documents/organization/164458.pdf [hereinafter *2011 TIP Report*]; *2012 TIP Report, supra* note 18, at 360; *2013 TIP Report, supra* note 6, at 381.
[21] *See* U.S. Dep't of Justice, *Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons Fiscal Year 2009*, 75, available at http://www.justice.gov/archive/ag/annualreports/tr2009/agreporthumantrafficking2009.pdf.
[22] Florida State University Center for the Advancement of Human Rights, *Florida Strategic Plan on Human Trafficking*, 39 (October 2010), *available at* http://www.cahr.fsu.edu/sub_category/floridastrategicplanonhumantrafficking.pdf.
[23] Dep't of Homeland Security, Office of Immigration Statistics, *Estimates of Unauthorized Immigration Population Residing in the U.S.: January 2011*, 4-5 (Mar. 2012), *available at* https://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf.
[24] John Bowe, *Nobodies: Does Slavery Exist in America?*, New Yorker, April 21, 2003, *available at* http://www.newyorker.com/archive/2003/04/21/030421fa_fact_bowe?currentPage=2.
[25] Coalition of Immokalee Workers, *Florida Modern-Day Slavery Museum: An Examination of the History and Evolution of Slavery in Florida's Fields*, 7-8, http://ciw-online.org/museum/booklet0811.pdf (last visited Apr. 3, 2014). *See also* Polaris Project, *supra* note 11.

-5-

NY 75034377v2

## B. The Plaintiffs' Factual Background

Plaintiffs were recruited along with other undocumented workers in the Immokalee and Clewiston area to work for Defendant C&C Agricultural Farms ("C&C Farms") in its fields and packinghouse located in an area of the Middle District of Florida known as "Devils Garden." Defendants targeted Plaintiffs because they are undocumented immigrants who possess limited education, work skills, and language skills. As such, Plaintiffs' employment options are limited and Plaintiffs are vulnerable to threats of deportation. Defendants enticed Plaintiffs to work for them by promising Plaintiffs a substantial number of hours of work each week, payable daily or weekly at the minimum hourly wage rate or higher. After hiring Plaintiffs, however, Defendants failed to compensate Plaintiffs properly, subjected Plaintiffs to inhumane working conditions, which included sexual harassment in one instance, and routinely threatened Plaintiffs with violence or deportation. Plaintiffs endured Defendants' actions because Plaintiffs and the families they support were, and remain, financially desperate and because they feared Defendants' threats of violence and deportation should they complain or quit.

### 1. Defendant Cordero's Threats of Violence

Defendant Ernesto Ruben Cordero, Jr. ("Cordero"), the partner and manager of Defendant C&C Farms, threatened Plaintiffs with physical harm on numerous occasions. Specifically, beginning in early 2010, Cordero regularly wore a gun in the waistband of his pants while supervising workers, and the gun was always noticeable to the workers. Compl. ¶ 53. He would flash the gun when yelling at workers to intimidate them, when angry at one of the Plaintiffs for being sick, or when he felt Plaintiffs and other workers were not working quickly enough. Id. at ¶¶ 52, 59-60. Cordero regularly transported a gun in his pickup truck and displayed it to Plaintiffs for the purpose of intimidating them. Id. at ¶ 55. Cordero also threatened the workers in Spanish that he could "fuck them up" and "kill a worker and simply

NY 75034377v2

leave the body in a ditch." Id. at ¶¶ 52, 56. Cordero made these threats in Spanish so that the Plaintiffs and other workers would be sure to understand his intentions. Cordero also threatened with his gun any worker who scratched his truck while removing work tools, and he even threatened to shoot a worker, who was merely leaning up against his truck while it was parked in the fields, if Cordero thought the worker damaged the truck. Id. at ¶¶ 57-58. Additionally, between approximately October 2009 and early 2010, non-defendant Crew Leader N.C. warned Plaintiff JOHN DOE #1 and other workers, in Spanish, that Cordero had guns, was erratic, and they "should exercise caution" in complaining about pay shortages or working conditions. Id. at ¶ 51.

### 2. Defendant Tapia-Ortiz's Threats of Violence

Defendant Reyes Tapia-Ortiz ("Tapia-Ortiz"), C&C Farm's labor contractor and transporter, also routinely threatened Plaintiffs and other workers with gun violence. Tapia-Ortiz regularly kept a rifle, either openly displayed or stored under the driver's seat of his transport van, and he occasionally brought it to the fields to scare the workers. Id. at ¶ 62. Often, he openly moved his rifle from one transport van to the other in the presence of the workers. Id. at ¶ 63. Further, Tapia-Ortiz stored a pistol in the van's glove compartment, and he would remove it in the presence of the workers, place it in the waistband of his pants, and keep it there while in the fields for the workers to see. Id. at ¶¶ 62-63.

A few weeks after Plaintiff JOHN DOE #3 began working for C&C Farms, he simply asked Tapia-Ortiz why he had not been paid for hours worked for C&C Farms, and in response Tapia-Ortiz removed two guns from under the driver's seat of one of the transport vans and twirled the guns in front of him. Id. at ¶ 64. After the incident, JOHN DOE #3 was afraid, continued working, and asked no further questions because of that fear. Id. In Spanish, Tapia-Ortiz threatened Plaintiffs with violence if they continued to complain or cause problems. Id. at

¶¶ 65-67. Specifically, he told Plaintiff JOHN DOE #4 and other workers that "he had a pistol and would not be the one to die" and that he would "beat up" complaining workers. Id. at ¶¶ 65, 67.

Tapia-Ortiz also threatened the female workers. In the presence of Plaintiff JANE DOE #1 and other workers, he boasted in Spanish that killing a worker would be "just like killing a dog." Id. at ¶ 70. On one occasion in 2011, Tapia-Ortiz pistol-whipped his common law wife at their residential trailer in Moore Haven, Florida in the presence of JANE DOE #1 and her boyfriend, who also shared that trailer. Id. at ¶ 71. On other occasions, JANE DOE #1 and her boyfriend heard the pistol-whipping, because they shared the trailer, or later saw the bruises on Tapia-Ortiz's common law wife. Id. This caused JANE DOE #1 to be greatly afraid of Tapia-Ortiz. Id. Tapia-Ortiz also regularly cleaned and loaded his pistol in front of JANE DOE #1 and her boyfriend. Id. at ¶ 72. Tapia-Ortiz' common law wife once showed JANE DOE #1 the gun under Tapia-Ortiz' pillow in his bedroom, explaining that he had used it to beat her. Id. at ¶¶ 72-73.

Tapia-Ortiz also brandished his gun with his finger on the trigger to intimidate Plaintiff JANE DOE #2 and others in the fields. Id. at ¶ 69 Further, Tapia-Ortiz told JANE DOE #2 in Spanish that he carried a gun in the fields to "scare the workers while they were working." Id. at ¶ 74. When JANE DOE #2 attempted to quit in the fall of 2011, Tapia-Ortiz threatened in Spanish that he would "find and kill" her if she quit working for him. Id. at ¶ 76.

Based on these incidents, JANE DOE #1 and JANE DOE #2, as well as other workers, feared for their lives.

### 3. Defendant Tapia-Ortiz' Sexual Harassment

Between August 2011 and February 2012, Tapia-Ortiz also sexually harassed JANE DOE #2 in person at C&C Farms and on the telephone by making unwelcome and unlawful sexual

advances, including groping her against her will and propositioning her for sex. Id. at ¶¶ 77-83. In fall 2011, on more than one occasion, Tapia-Ortiz propositioned JANE DOE #2 for sex, promising to pay her more money if she traveled to Miami and engaged in a sexual relationship with him. Id. at ¶ 78. Around this time, Tapia-Ortiz grabbed JANE DOE #2 from behind and fondled her breasts. Id. at ¶ 79. JANE DOE #2 rejected these advances and threatened to call the police. Id. at ¶ 80. Tapia-Ortiz responded that the police did not care about her and that she would get deported should she contact the police. Id. Further, when JANE DOE #2 resisted Tapia-Ortiz's sexual advances for a second time, this time in a secluded location in the fields of C&C Farms, he lifted his shirt to display his pistol tucked into his waistband. Id. at ¶ 81. On other occasions, Tapia-Ortiz forcibly grabbed and groped JANE DOE #2's breasts, buttocks, and thigh in the fields. Id. at ¶¶ 82-83. JANE DOE #2 never consented to this contact and always explicitly refused Tapia-Ortiz's sexual advances. Id. Between September 2011 and January 2012, Tapia-Ortiz also threatened to injure and deport Plaintiff JOHN DOE #3, who was JANE DOE #2's boyfriend, if she continued to reject or attempted to report Tapia-Ortiz's advances. Id. at ¶¶ 84-85. All of these incidents made JANE DOE #2 fearful for her own life, the life of JOHN DOE #3, and her ability to remain in the United States. Id.

Tapia-Ortiz also sexually harassed another worker at C&C Farms – Janny Ann Rosa Santiago, a non-plaintiff who worked as an assistant to Defendant Cordero. See Ex. 1, Hendry County Sherriff's Office Offense Report. On January 8, 2012, Cordero sent Santiago to wash a "packing machine" with Diego Lopez, another C&C Farms employee. Id. Tapia-Ortiz joined them, and he and Lopez asked if she would engage in sexual intercourse for $100. Id. She ignored them and continued to work, but Tapia-Ortiz pushed her against the machine and began kissing her on the right side of her face. Id. She pushed him away. Id. Tapia-Ortiz told her how

"excited" he got just by kissing her and that "next time she wasn't getting away from him." Id. She reported this battery to the Hendry County Sherriff's Office on January 27, 2012. Id. In addition to recounting the incident, Santiago informed the police that when Tapia-Ortiz grabbed her, she feared for her life and expected that he would do something else to hurt her. Id.

When the police followed up with Santiago on February 1, 2012, Santiago reported that Tapia-Ortiz repeated his advances, "except this time he was much more aggressive." Id. She reported that Tapia-Ortiz repeatedly told her that "next time he was going to get her even if she didn't want to." Id. Santiago reported to the police that she was afraid Tapia-Ortiz would rape her or otherwise use force against her, noting that he carried a pocket knife with him and that the weapon was visible during the second incident. Id. Santiago also told police that she received a telephone call from Tapia-Ortiz on January 29, 2012 whereby he stated that he was "going to get her wherever he saw her at." Id.

Tapia-Ortiz was charged with battery under Florida state criminal law. For reasons unknown to Plaintiffs, however, the State did not pursue the case further, and Santiago continued to work at C&C Farms. See Ex. 2, Hendry County Court Record, Case # 12-MM-154.

### 4. Defendant Tapia-Ortiz' Threats of Deportation

In addition to threats of gun violence and incidents of sexual assault, on several occasions Tapia-Ortiz threatened to have Plaintiffs deported. Compl. ¶ 86. Specifically, Tapia-Ortiz threatened JOHN DOE #3 in Spanish that he would be deported if he refused to transport workers to C&C Farms, and informed him that he already arranged for the deportation of another van driver for refusing to continue to work for Tapia-Ortiz. Id. at ¶ 86(i). Tapia-Ortiz also told JANE DOE #2 and other workers that if they quit working for C&C Farms, he would call immigration and have them deported. Id. at ¶ 86(ii). Further, when JANE DOE #2 and other

workers confronted Tapia-Ortiz about not being paid on several occasions, he responded that their complaints were futile "because they do not have papers." Id. at ¶¶ 86(ii)-(iv).

Additionally, Tapia-Ortiz demonstrated that his threats of deportation were not empty when he arranged to have JANE DOE #1's boyfriend deported in December 2011. Id. at ¶ 89. Tapia-Ortiz did this because JANE DOE #1 and her boyfriend, the latter of whom drove transport vans for Defendants, announced that they were quitting because they had not been paid in over two weeks. Id. at ¶ 87. Tapia-Ortiz threatened that he would not pay their wages unless they agreed to continue working at C&C Farms and that they "would be sorry" if they quit. Id. at ¶¶ 87-88. On or around December 21, 2011, Tapia-Ortiz made good on his threats and arranged for an unlicensed bondsman to seize JANE DOE #1's boyfriend in the middle of the night. Id. at ¶ 89. In Plaintiff JANE DOE #1's presence, the unlicensed bondsman chained her boyfriend's arms and legs and took him to jail. Id. Thereafter, her boyfriend was deported. Id. Throughout that night, JANE DOE #1 hid in the woods in terror. Id. at ¶ 90. Two days after the incident, Tapia-Ortiz threatened that if JANE DOE #1 told anyone about the earlier events, he would burn her in the trailer and "shut her mouth forever." Id. at ¶ 91.

It is on the basis of the sensitive nature of the Defendants' above threats and actions that Plaintiffs seek the Court's permission to proceed anonymously.

### III. MEMORANDUM OF LAW

#### A. Plaintiffs' Motion to Proceed Anonymously Meets Eleventh Circuit Test and Threshold

The Federal Rules of Civil Procedure generally require that every pleading must name all of the parties, but courts retain jurisdiction to allow a party to proceed anonymously in a civil suit where the party "has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" Plaintiff B v.

-11-

NY 75034377v2

Francis, 631 F.3d 1310, 1316 (11th Cir. 2011) (citing Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992)). While federal courts generally disfavor anonymity, as defendants have a right to know the identity of their accusers, "[a] plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." Frank, 951 F.2d at 324.

The Eleventh Circuit has instructed that, in conducting such an evaluation, a court "should carefully review *all* the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." Francis, 631 F.3d at 1316 (citing Frank, 951 F.2d at 323). The first step is to look at three factors: (1) whether the plaintiff seeking anonymity is challenging government activity; (2) whether the plaintiff will be required to disclose information of the utmost intimacy; and (3) whether the plaintiff will be compelled to admit his or her intention to engage in illegal conduct and thus risk criminal prosecution. Id.; Frank, 951 F.2d at 323 (citing Doe v. Stegall, 653 F.2d 180, 185 (5th Cir. Unit A Aug. 1981)). Courts have also considered additional factors, including whether plaintiffs were minors, whether plaintiffs were threatened with violence or physical harm by proceeding in their own names, and whether proceeding anonymously posed a unique threat of fundamental unfairness to the defendant. Francis, at 1316.

The three-factored test enumerated by the Fifth Circuit in Doe v. Stegall, and adopted by the Eleventh Circuit in Doe v. Frank and Plaintiff B v. Francis, was not intended to be applied rigidly. Frank, 951 F.2d at 323. These factors are not exclusive, nor is any one factor dispositive. Id. Rather, "they were highlighted merely as factors deserving consideration. A judge, therefore, should carefully review all the circumstances of a given case and then decide

-12-

NY 75034377v2

whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." Id. (citing Southern Methodist Univ. Ass'n v. Wynne & Jaffe, 599 F.2d 707, 713 (5th Cir.1979)).

An application of the Stegall test weighs heavily in favor of allowing Plaintiffs to proceed anonymously. Here, Plaintiffs are not challenging government activity; however, they were all undocumented immigrants and present in this country illegally during the time of their employment at C&C Farms. Further, their undocumented status is an essential component in many of Plaintiffs' causes of action against Defendants, as Defendants targeted them based on their status; there is no way for Plaintiffs to avoid admission of illegal conduct in pursuing this case. Presently, four of the Plaintiffs still reside in Florida. In identifying themselves, Plaintiffs currently living in Florida risk criminal prosecution for illegally entering and remaining in the United States, pursuant to 8 U.S.C. § 1325, and eventual deportation. See 8 U.S.C. § 1325 (2012). Moreover, should Plaintiffs be required to proceed using their own names, U.S Immigration and Customs Enforcement ("ICE") will have their names and, regardless of deportation procedures, Plaintiffs will be completely unable to find work in the U.S. This means they will be entirely unable to support themselves and their families. Thus, the third Stegall factor weighs heavily in favor of preserving Plaintiffs' anonymity with respect to these Plaintiffs.

In addition, Plaintiff B v. Francis instructs the Eleventh Circuit to consider the totality of circumstances. Here, such a consideration adequately justifies Plaintiffs' motion to proceed anonymously. Plaintiffs have a legitimate and credible fear of retaliatory physical violence if they proceed using their names. As indicated above, Defendants have on numerous occasions threatened Plaintiffs with physical harm, particularly gun violence. Defendants routinely brandished firearms in the fields with the explicit intent of intimidating Plaintiffs into continuing

to work under deplorable conditions and to keep them from complaining. Defendants have also explicitly threatened Plaintiffs with physical violence in Spanish so that Plaintiffs were sure to understand Defendants' words. Further, Defendant Tapia-Ortiz sexually harassed Plaintiff JANE DOE #2 on several occasions and threatened her physical safety, as well as the safety of her boyfriend, if she tried to resist Tapia-Ortiz's advances or even complain about these incidents. Additionally, Tapia-Ortiz demonstrated his willingness to make good on his threats of violence and deportation by arranging for an unlicensed bondsman to seize Plaintiff JANE DOE #1's boyfriend in the middle of the night in the presence of JANE DOE #1, resulting in his deportation. Following that incident, Tapia-Ortiz threatened in Spanish to burn JANE DOE #1 in her trailer should she report her boyfriend's seizure.

Given that Defendants have threatened Plaintiffs with gun violence on numerous occasions for merely complaining about poor working conditions and lack of pay, it is highly likely that Defendants will come after Plaintiffs in retaliation for bringing this lawsuit against them. If Plaintiffs are forced to proceed under their own names, they are at grave risk of Defendants finding them and seriously injuring or even killing them. This is a particularly frightening possibility for Plaintiffs because Defendant Tapia-Ortiz previously promised to "find and kill" JANE DOE #2 simply for leaving C&C Farms. Although none of the Plaintiffs presently work for Defendants, Plaintiffs JANE DOE #1, JANE DOE #2, JOHN DOE #1, and JOHN DOE #2 all still live in the Immokalee area, making them increasingly vulnerable to Defendants' rage and retaliation.

Although JOHN DOE #3 and JOHN DOE #4 no longer reside in Florida, Defendants have connections and methods with which to track down these Plaintiffs in Mexico and Guatemala. Tapia-Ortiz bragged to Plaintiff JANE DOE #1 that he and his family were *narcos*,

or internationally connected, and could find them anywhere he had connections. Further, because these Plaintiffs reside outside of the U.S., they can be offered no other form of legal protection, to which their co-Plaintiffs might be entitled due to their U.S. residency. Thus, protecting their anonymity is crucial to their safety, and they, too, risk their lives in proceeding under their names in this lawsuit.

Plaintiffs also have reason to fear for the safety of their loved ones. During her employment, Defendant Tapia-Ortiz claimed to know the whereabouts of Plaintiff JANE DOE #1's mother, undoubtedly using this information to keep JANE DOE #1 from complaining or leaving C&C Farms. JANE DOE #1 also has a child residing with a paternal grandparent and a sister living in the Clewiston area. Further, when she spent the night in the woods after Tapia-Ortiz arranged to have her boyfriend seized and deported, JANE DOE #1 left behind papers in the trailer she shared with Tapia-Ortiz, including money orders and other documents possibly listing the names and/or addresses of family members. Plaintiffs JOHN DOE #3 and JOHN DOE #4 also have family members living in the Clewiston/Moore Haven area, and Tapia-Ortiz knows the whereabouts of these family members, as well. Thus, Defendants could easily find and physically harm Plaintiffs' family members and/or use the family members to track down Plaintiffs, individually, and physically harm or harass them, as well. Further, because Tapia-Ortiz arranged to have JANE DOE #1's boyfriend seized in the middle of the night and subsequently deported, this demonstrates a willingness to hurt Plaintiffs' loved ones in order to keep Plaintiffs in line.

Thus, Plaintiffs' collective fears of violence and deportation are credible and sincerely held, rather than theoretical. Based on the totality of circumstances, Plaintiffs should be allowed to proceed anonymously.

### B. Granting Plaintiffs' Motion to Proceed Anonymously Is Consistent with Case Law Across the United States.

Although the Eleventh Circuit lacks precedent on this narrow issue – whether or not undocumented immigrants may proceed anonymously – granting this motion would be consistent with case law across the United States.

In Javier H. v. Garcia-Botello, 211 F.R.D. 194 (W.D.N.Y. 2002), a group of ten migrant farm workers, some of whom were undocumented immigrants, filed a complaint against their employers, seeking damages and/or injunctive relief under the Fair Labor Standards Act ("FLSA"), the Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), New York labor law, and New York contract law. The District Court for the Western District of New York granted plaintiffs' motion to proceed anonymously. There, the court employed a five-factored test, the first three of which are identical to the Stegall test. The other two factors considered were "(4) whether the plaintiff would risk suffering injury if identified; and (5) whether the party defending against a suit brought under a pseudonym would be prejudiced." Javier H., 211 F.R.D. at 195.

The court found the fourth factor to be decisive, holding that plaintiffs' fear of retaliation by defendants was sufficiently well-founded to warrant allowing them to proceed anonymously. There, defendants had previously threatened plaintiffs with physical violence, and defendants were also criminally indicted by a grand jury with serious crimes arising out of the same facts supporting the plaintiffs' civil case. The court recognized that if plaintiffs identified themselves, defendants might attempt to prevent plaintiffs from pursuing their case in any way possible, including through violence. The court found no prejudice to defendants in allowing plaintiffs to proceed anonymously.

NY 75034377v2

Here, Plaintiffs' are also migrant farm workers who are undocumented and have been threatened with brutal physical harm on numerous occasions. Although no criminal proceeding has yet been filed against Defendants, Plaintiffs' fears of Defendants' physical retaliation against them is well-founded, as articulated above, and like those of the plaintiffs in <u>Javier H</u>. Further, there is no evidence that Defendants would be prejudiced by allowing Plaintiffs to proceed anonymously at this time, particularly where, as here, the order Plaintiffs seek would allow Defendants' counsel to reveal Plaintiffs' identities to the Defendants and those parties necessary to prepare Defendants' case. Thus, allowing Plaintiffs to proceed anonymously would be consistent with the above case.

In <u>Lozano v. City of Hazleton</u>, 496 F.Supp.2d 477 (M.D. Pa 2007), documented and undocumented immigrants brought an action challenging the validity of ordinances regulating the rental housing and employment of undocumented immigrants. There, too, the District Court for the Middle District of Pennsylvania allowed those plaintiffs with uncertain immigration status to proceed anonymously, and the Third Circuit affirmed. <u>Lozano v. City of Hazelton</u>, 620 F.3d 170 (3d Cir. 2010), <u>vacated and remanded on other grounds</u>, 131 S.Ct. 2958 (2011), <u>aff'd in part, rev'd in part</u>, 724 F.3d 297 (2013). The court weighed and discussed a series of nine factors, eventually holding in favor of plaintiffs. The court found in favor of proceeding anonymously mainly because ethnic tensions had escalated in the locality enacting the ordinances and "that the named [p]laintiffs had been harassed and intimidated for their involvement in this litigation" and the unnamed plaintiffs would face an "exponentially greater" risk of harassment and even physical harm because of their undocumented status. <u>Id.</u> at 195; <u>see also</u> <u>Keller v. City of Fremont</u>, 2011 WL 41902, Nos. 8:10–cv–0270–LSC–FG3, 4:10–cv–3140–LSC–FG3 (D. Neb. Jan. 5, 2011) (applying the <u>Lozano</u> holding to an analogous case involving

NY 75034377v2

undocumented foreign nationals challenging a similar local ordinance regulating leases to undocumented immigrants). Further, the court found that requiring plaintiffs to identify themselves might dissuade other similarly situated persons from bringing cases clarifying constitutional rights. Id.

Here, Plaintiffs have already been harassed by Defendants and threatened with violence and deportation merely for complaining about fair compensation and working conditions. Based on Defendants' prior threats to Plaintiffs, it follows that if Plaintiffs brought this civil action in their own names, Defendants might carry out those threats through physical retaliation. Additionally, like the unnamed plaintiffs in Lozano, requiring Plaintiffs to identify themselves in this litigation would dissuade other similarly situated abused migrant workers from bringing similar actions. As detailed above, abuse of undocumented workers is a grave problem, and there are no doubt similar instances of abuse occurring elsewhere throughout Florida. Denying Plaintiffs' motion to proceed anonymously may negatively influence the decision of other migrant workers to bring similar cases against offending employers, allowing such employers to escape justice and enabling them to continue long-standing abusive practices of migrant workers. Thus, an application of Lozano supports Plaintiffs' current motion to proceed anonymously.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion and allow Plaintiffs to proceed anonymously with their Complaint.

Dated: April 9, 2014

Respectfully submitted,

By: s/ [signature]
Robert T. Wright, Jr.
Florida Bar No. 185525
**STROOCK & STROOCK & LAVAN LLP**
200 South Biscayne Blvd., Suite 3100
Miami, Florida 33131
Telephone: (305) 358-9900
Facsimile: (305) 789-9302
Email: rwright@stroock.com

Professor Arturo Carrillo (*pro hac vice pending*)
Director, International Human Rights Clinic
New York Bar Registration No. 4004040
District of Columbia Bar No. 482581
George Washington University Law School
2000 G Street, NW
Washington, D.C. 20052
Telephone: (202) 994-4946
acarrillo@law.gwu.edu

Susan L. French (*pro hac vice pending*)
Senior Staff Attorney
International Human Rights Clinic
Virginia Bar No. 14141
George Washington University Law School
2000 G. Street, NW
Washington, D.C. 20052
Telephone: (202) 202-7397
sfrench@law.gwu.edu

*Counsel for Plaintiffs*

NY 75034377v2